Nos. 22-2220(L), 23-1096

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

DUKE ENERGY PROGRESS, LLC,

*Petitioner/Intervenor*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents*,

BELLSOUTH TELECOMMUNICATIONS, LLC,
d/b/a AT&T North Carolina, d/b/a AT&T South Carolina,

*Intervenor/Petitioner*.

On Petitions for Review of an Order of the Federal Communications Commission

**PAGE-PROOF BRIEF FOR USTELECOM – THE BROADBAND
ASSOCIATION AS *AMICUS CURIAE* IN SUPPORT OF RESPONDENTS
AND IN OPPOSITION TO DUKE ENERGY PROGRESS, LLC**

Scott H. Angstreich
Alex P. Treiger
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
sangstreich@kellogghansen.com
atreiger@kellogghansen.com

*Counsel for Amicus Curiae USTelecom
– The Broadband Association*

July 13, 2023

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __22-2220__      Caption: __Duke Energy Progress, LLC v. FCC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__USTelecom -- The Broadband Association__
(name of party/amicus)

_____

 who is _____amicus curiae_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                           ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☐NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Scott H. Angstreich                   Date:        07/13/2023

Counsel for: USTelecom

Print to PDF for Filing

ii

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES ................................................................................ iv

STATEMENT OF INTEREST AND AUTHORITY TO FILE .............................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 2

ARGUMENT ....................................................................................................... 4

I.   The Court Should Reject Duke's Challenge to the Commission's
     Authority To Ensure That All Providers of Telecommunications
     Service Pay Just and Reasonable Rates for Attachments to Electric
     Utility Poles ................................................................................................. 4

     A.   Issue Preclusion Bars Duke's Challenge ................................................ 4

     B.   Section 224 Guarantees Incumbent Local Telephone
          Companies Just and Reasonable Pole Attachment Rates ..................... 7

II.  The Commission Properly Held That Duke Must Bear the Costs of
     Safety Space ............................................................................................... 11

III. There Is No Inconsistency Between the *Order* and the Non-Binding
     Enforcement Bureau Decision in *Verizon Florida* ....................................... 12

CONCLUSION .................................................................................................. 14

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Am. Elec. Power Serv. Corp. v. FCC*, 708 F.3d 183
(D.C. Cir. 2013) ....................................................................3, 5, 6, 8, 9, 10

*Beavers v. W. Penn Power Co.*, 436 F.2d 869 (3d Cir. 1971) ...................................2

*BellSouth Telecomms., Inc. v. Sanford*, 494 F.3d 439
(4th Cir. 2007) ....................................................................................8

*Copperweld Corp. v. Independence Tube Co.*, 467 U.S. 752 (1984) .......................5

*Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383 (2015) ....................................9

*FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307 (1993).............................................11

*Gulf Power Co. v. FCC*, 669 F.3d 320 (D.C. Cir. 2012) ......................................5, 6

*Nat'l Cable & Telecomms. Ass'n v. Gulf Power Co.*, 534 U.S. 327
(2002)................................................................................................2

*Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1 (D.C. Cir. 2011).......................................9

*Qwest Corp. v FCC*, 252 F.3d 462 (D.C. Cir. 2001) ............................................6, 7

*SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021
(D.C. Cir. 2017) ...................................................................................13

*Sorenson Commc'ns, Inc. v. FCC*, 765 F.3d 37 (D.C. Cir. 2014) ............................6

*Taylor v. Sturgell*, 553 U.S. 880 (2008)..................................................................6

*Yamaha Corp. of Am. v. United States*, 961 F.2d 245
(D.C. Cir. 1992) .....................................................................................7

## STATUTES AND RULES

47 U.S.C. § 153 ................................................................................8

47 U.S.C. § 153(51) .......................................................................9, 10

47 U.S.C. § 224 ................................................ 3, 4, 5, 6, 7, 8, 9, 10, 12

47 U.S.C. § 224(a)(4)....................................................................2, 8, 9

47 U.S.C. § 224(a)(5)...................................................................5, 9, 10

47 U.S.C. § 224(b)(1)...................................................................2, 5, 8, 9

47 U.S.C. § 224(f) ............................................................................8

47 U.S.C. § 224(f)(1)......................................................................8, 9

Fed. R. App. P. 29(a)(2)......................................................................1

Fed. R. App. P. 29(a)(4)(E)...................................................................1

## ADMINISTRATIVE DECISIONS

Memorandum Opinion and Order, *Verizon Fla. LLC v. Fla. Power & Light Co.*, 30 FCC Rcd 1140 (Enf. Bur. 2015) ........................4, 12, 13, 14

Order on Reconsideration, *Verizon Md. LLC v. Potomac Edison Co.*, Proc. No. 19-355, FCC 22-26 (rel. Mar. 31, 2022) ...............................14

Report and Order, *Amendment of Rules and Policies Governing Pole Attachments*, 15 FCC Rcd 6453 (2000) .................................................12

Report and Order and Order on Reconsideration, *Implementation of Section 224 of the Act*, 26 FCC Rcd 5240 (2011) ...........................4, 11, 13

**OTHER AUTHORITIES**

Duke Energy Corp., Form 10-K, Annual Report for the Fiscal Year
    Ended Dec. 31, 2022 (Feb. 27, 2023) ................................................................ 5

Pet'rs Br., No. 11-1146, 2012 WL 1408805 (D.C. Cir.
    Apr. 23, 2012) ................................................................................................ 5

S. Rep. No. 95-580 (1977) ........................................................................................ 11

## STATEMENT OF INTEREST AND AUTHORITY TO FILE[1]

USTelecom's members include incumbent local telephone companies that provide telecommunications services to customers in the states within this Circuit. To reach their customers, these members often must attach their facilities to poles that electric utilities like Duke Energy Progress, LLC ("Duke") own.

USTelecom, through its members, has a direct interest in this case. Duke asks this Court to upend the settled authority of the Federal Communications Commission ("Commission") to ensure the rates incumbent local telephone companies pay to attach equipment to electric utility poles are just and reasonable. Given the well-documented history of electric utilities charging excessive rates for those attachments, the Commission's oversight is vital to prevent arbitrary rate disparities that distort competition and harm consumers.

For the reasons in the Commission's brief, BellSouth Telecommunications, LLC's ("AT&T") brief, and this brief, the Court should deny Duke's petition for review.[2]

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), USTelecom affirms that no counsel for a party authored this brief in whole or in part and that no person other than *amicus* or its counsel made a monetary contribution to fund this brief's preparation or submission. All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2).

[2] Although USTelecom is filing this brief only to respond to Duke's petition for review, it agrees with AT&T's arguments in support of its petition for review challenging the Commission's rulings in Duke's favor.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Attaching communications equipment and power lines to the same poles "prevent[s] the unsightly and uneconomical duplication of" pole networks. *Beavers v. W. Penn Power Co.*, 436 F.2d 869, 873 (3d Cir. 1971). But, because electric utilities own most of the existing poles, they can charge "monopoly rents" for pole access. *Nat'l Cable & Telecomms. Ass'n v. Gulf Power Co.*, 534 U.S. 327, 330 (2002). To prevent this, Congress directed the Commission to ensure "just and reasonable" rates for "pole attachments," defined as "any attachment" by a "provider of telecommunications service" — a term that includes both incumbent local telephone companies and new entrants. 47 U.S.C. § 224(a)(4), (b)(1). In the *Order*,[3] the Commission found that the rates Duke charged AT&T were unjust and unreasonable: they were "higher than" the rates that other telecommunications services providers and cable companies paid under the Commission's rate formulas (both the "new" and "old" telecom rates), and "disproportionate to the amount of space AT&T and Duke each uses on the poles." *Order* ¶ 24 (JA___).

The Commission and AT&T ably demonstrate that Duke's challenges to the *Order* lack merit. USTelecom writes separately to emphasize three points.

---

[3] Order on Reconsideration and Review, *BellSouth Telecomms., LLC v. Duke Energy Progress, LLC*, Proc. No. 20-293, FCC 22-90 (rel. Nov. 18, 2022) ("*Order*") (JA___-___).

*First*, Duke is precluded from challenging the Commission's authority to regulate the pole attachment rates that electric utilities charge incumbent local telephone companies. Duke's parent company made the same arguments more than a decade ago in the D.C. Circuit, where it lost. *See Am. Elec. Power Serv. Corp. v. FCC*, 708 F.3d 183, 186-88 (D.C. Cir. 2013) ("*AEP*"). Issue preclusion therefore bars Duke from re-litigating that loss here. Even if Duke could raise its challenge anew, Section 224's plain language and structure make clear that all telephone companies — including incumbent local telephone companies — are entitled to just and reasonable pole attachment rates. Duke's arguments attempt to rewrite the statute and provide no basis to create a circuit split.

*Second*, Duke cannot shift to AT&T or other incumbent local telephone companies the cost of the 40 inches of safety space required because Duke's wires transmitting high-voltage electricity are inherently dangerous. Incumbent local telephone companies' attachments are nowhere near the safety space. And Duke admits that it cannot charge other attachers, located higher on the pole (and therefore closer to the safety space), for that space. The Commission's long-standing conclusion that electric utilities must bear those costs is sound.

3

*Finally*, the *Order* accords with *Verizon Florida*.[4]  Although an Enforcement Bureau decision like *Verizon Florida* does not bind the Commission — so Duke's claim of an inconsistency fails at the outset — the Commission nonetheless applied the same standard here that the Bureau did there.  The outcome is different because the Commission found the facts are.

## ARGUMENT

**I.    The Court Should Reject Duke's Challenge to the Commission's Authority To Ensure That All Providers of Telecommunications Service Pay Just and Reasonable Rates for Attachments to Electric Utility Poles**

### A.    Issue Preclusion Bars Duke's Challenge

Duke's parent company previously litigated and lost the question whether the Commission can regulate the pole attachment rates electric utilities charge to incumbent local telephone companies.  Therefore, as the Commission explains (at 41-45), issue preclusion bars Duke from re-litigating that question here.

In 2011, the Commission issued an order concluding that Section 224's guarantee of just and reasonable pole attachment rates extends to incumbent local telephone companies.  *2011 Order*[5] ¶ 208.  Duke's ultimate parent company, Duke

---

[4] Memorandum Opinion and Order, *Verizon Fla. LLC v. Fla. Power & Light Co.*, 30 FCC Rcd 1140 (Enf. Bur. 2015) ("*Verizon Florida*").

[5] Report and Order and Order on Reconsideration, *Implementation of Section 224 of the Act*, 26 FCC Rcd 5240 (2011) ("*2011 Order*").

4

Energy Corporation,[6] challenged that decision in the D.C. Circuit, in which it made many of the arguments that Duke makes here. Duke Energy Corporation argued that Section 224(a)(5) excludes incumbent local telephone companies from Section 224(b)(1)'s requirement that electric utilities charge only just and reasonable pole attachment rates. *Compare* Pet'rs Br. 20-24, No. 11-1146, 2012 WL 1408805 (D.C. Cir. Apr. 23, 2012) ("Pet'rs Br."), *with* Duke Br. 40-43. It also argued that Section 224's legislative history foreclosed the Commission's interpretation of Section 224(b)(1). *Compare* Pet'rs Br. 24-25, *with* Duke Br. 43-46. The D.C. Circuit rejected both arguments, holding that Section 224 gives the Commission authority to regulate the rates electric utilities charge for incumbent local telephone companies' pole attachments. *See AEP*, 708 F.3d at 188.[7]

Duke and Duke Energy Corporation "have a complete unity of interest." *Copperweld Corp. v. Independence Tube Co.*, 467 U.S. 752, 771 (1984). Indeed, Duke's counsel represented Duke Energy Corporation in *AEP*; he signed the briefs and argued the case. *See Gulf Power Co. v. FCC*, 669 F.3d 320, 324 (D.C. Cir. 2012) (finding these facts showed nonparty "had an ample day in court"). Issue preclusion therefore bars Duke from repeating the same arguments its parent raised

---

[6] Duke Energy Corp., Form 10-K, Annual Report for the Fiscal Year Ended Dec. 31, 2022, at 9 (Feb. 27, 2023).

[7] As the Commission notes (at 43-44), Duke Energy Corporation also unsuccessfully tried to raise these same challenges in the Ninth Circuit.

and lost.  *See Taylor v. Sturgell*, 553 U.S. 880, 894 (2008) (issue preclusion applies when the nonparty was "adequately represented by someone with the same interests" in the prior litigation).

Courts of appeal routinely apply issue preclusion to prevent parties from re-litigating final losses against the Commission.  For example, in *Gulf Power*, Gulf challenged an order enforcing Section 224's rate formula for pole attachments by cable operators as an unconstitutional taking.  *See* 669 F.3d at 322.  The D.C. Circuit held that an earlier appellate decision rejecting "a challenge by Gulf's sister company to the precise scheme at issue" precluded Gulf's challenge.  *Id.* at 323. And while Duke frames its argument (at 14) as asserting that *AEP* was "wrongly decided," the D.C. Circuit rejected that same bid to evade issue preclusion in *Gulf Power*.  The court reasoned that, "if an issue can be turned into a new issue merely by asking whether it had been rightly decided, collateral estoppel would never apply."  669 F.3d at 324.

*Sorenson Communications, Inc. v. FCC*, 765 F.3d 37 (D.C. Cir. 2014), is also instructive.  There, the D.C. Circuit held that Sorenson could not challenge the exclusion of certain expenses for being non-compensable in a Commission rate order because Sorenson was "merely attempting to relitigate an application of the standard it challenged" unsuccessfully three years earlier in the Tenth Circuit.  *Id.* at 44.  Likewise, in *Qwest Corp. v FCC*, 252 F.3d 462 (D.C. Cir. 2001), local

exchange carriers challenged the Commission's use of a dispute-resolution procedure that the Commission had adopted in an order the carriers had unsuccessfully challenged in the Eighth Circuit. *Id.* at 463. The D.C. Circuit held that the Eighth Circuit decision "bound" petitioners and precluded their challenge. *Id.* at 463-64.

Issue preclusion also bars the one different argument Duke raises here (at 46-49): that the Commission either cannot or should not regulate the rates electric utilities charge incumbent local telephone companies because Section 224 does not authorize the Commission to regulate the rates those utilities pay the incumbents for attachments. "[O]nce an *issue* is raised and determined, it is the entire *issue* that is precluded, not just the particular arguments raised in support of it in the first case." *Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992). Duke Energy Corporation asked the D.C. Circuit whether the Commission can regulate the rates electric utilities charge incumbent local telephone companies for pole attachments. The D.C. Circuit answered "yes." That forecloses Duke from trying out new arguments that Duke Energy Corporation chose not to raise.

**B.    Section 224 Guarantees Incumbent Local Telephone Companies Just and Reasonable Pole Attachment Rates**

**1.**    If the Court reaches the merits, it should deny Duke's challenge because incumbent local telephone companies, like all providers of

telecommunications service, have a statutory right to just and reasonable pole attachment rates. That conclusion follows from Section 224's plain text.

Section 224(b)(1) states that "the Commission *shall* regulate the rates, terms, and conditions for *pole attachments* to provide that such rates, terms, and conditions are just and reasonable." 47 U.S.C. § 224(b)(1) (emphases added). Congress defined a "pole attachment" as "any attachment" to a utility pole "by a cable television system or *provider of telecommunications service*." *Id.* § 224(a)(4) (emphasis added). There is no dispute that incumbent local telephone companies are "providers of telecommunications service" as the Communications Act defines that term. *See*, *e.g.*, *BellSouth Telecomms., Inc. v. Sanford*, 494 F.3d 439, 449 (4th Cir. 2007) (citing 47 U.S.C. § 153). Section 224(a)(4) thus "embraces" incumbent local telephone companies "rather than excludes them." *See AEP*, 708 F.3d at 187.

The neighboring provisions in Section 224 confirm that Congress directed the Commission to ensure that all providers of telecommunications service pay just and reasonable rates. Section 224(f) creates a separate right of nondiscriminatory pole access for "a cable television system or any telecommunications carrier." 47 U.S.C. § 224(f)(1). But, while incumbent local telephone companies (known formally in industry terminology as "incumbent local exchange carriers," or "ILECs") fit within the Communications Act's general definition of

"telecommunications carrier," *see id.* § 153(51), Congress crafted a special,

narrower definition for Section 224:

> For purposes of this section, the term "telecommunications carrier"
> (as defined in section 153 of this title) does not include any incumbent
> local exchange carrier as defined in section 251(h) of this title.

*Id.* § 224(a)(5).  As the Commission explains (at 48), if Congress had wanted to

exclude incumbent local telephone companies from Section 224(b)(1)'s just-and-

reasonable-rate entitlement — as it did from Section 224(f)(1)'s right to

nondiscriminatory pole access — it would have used "telecommunications carrier"

and not "provider of telecommunications service" in Section 224(a)(4).  The

"intentional character in § 224(a)(4)'s use of the broader term," *AEP*, 708 F.3d at

187, leaves no doubt that Congress intended to guarantee just and reasonable pole

attachment rates to all telephone companies, including incumbents.  *See Dep't of*

*Homeland Sec. v. MacLean*, 574 U.S. 383, 392 (2015) ("canon that Congress acts

intentionally when it omits language included elsewhere applies with particular

force" when Congress uses different terms "in close proximity").[8]

---

[8] Duke contends (at 42-43) that the different-terms canon is inapplicable, but its key case, *Northeast Hospital Corp. v. Sebelius*, 657 F.3d 1 (D.C. Cir. 2011), undercuts its argument.  There, the D.C. Circuit found the canon carried "little weight" where Congress referred to potential Medicaid beneficiaries as "eligible" but potential Medicare beneficiaries as "entitled" "for no reason whatever that anyone . . . has been able to divine."  *Id.* at 12.  Here, Congress used different terms in Section 224 to confer different rights on different classes of providers to correct different market failures.

**2.**     The Commission (at 45-53) and AT&T (at 58-63) demonstrate the flaws in Duke's contrary arguments.

First, Duke argues (at 40-43) that Congress's exclusion of incumbent local telephone companies from the term "telecommunications carrier" should also exclude them from the different phrase "provider of telecommunications service." But Section 224(a)(5) demonstrates that Congress knew how to exclude incumbent local telephone companies from the rights Section 224 guarantees.  The fact that Section 153(51) defines a "telecommunication carrier" to include "any provider of telecommunications services," 47 U.S.C. § 153(51), is thus of no help to Duke.  As the D.C. Circuit explained in rejecting that argument, Section 153(51) is "the *general* definition of telecommunications carrier, not the one tailored to § 224." *AEP*, 708 F.3d at 187.

Duke asserts (at 46-51) that the Commission lacks authority to regulate the rates it pays AT&T for pole attachments, but, as the Commission explains (at 53), its rules permit electric utilities to file complaints about those rates.  Regardless, Duke's argument is no reason to read the statute contrary to its plain language. Congress created the Commission to enforce the *Communications* Act of 1934.  It is unsurprising that Congress's direction to the Commission focuses on the pole attachment rates that communications providers pay.

Congress also was reacting to the long history of electric utilities charging excessive rates for pole access. In 1978, Congress responded to evidence that electric utilities were "demanding exorbitant rental fees and other unfair terms in return for the right to lease pole space" by directing the Commission to regulate the pole attachment rates that cable operators pay. S. Rep. No. 95-580, at 13 (1977). In 2011, the Commission found that, in the absence of Commission oversight, incumbent local telephone companies collectively were paying electric utilities $320 to $350 million more per year for pole access than they would pay under the regulated rate for cable operators. *2011 Order* ¶ 208. Duke points to no evidence of incumbent local telephone companies demanding that electric utilities pay similarly exorbitant rates. Nor is there any. In all events, Congress has substantial "leeway to approach a perceived problem incrementally" when "[d]efining the class of persons subject to a regulatory requirement." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315-16 (1993).

## II.    The Commission Properly Held That Duke Must Bear the Costs of Safety Space

As the Commission (at 67-74) and AT&T (at 52-58) explain, the Commission correctly rejected Duke's effort to shift to AT&T the costs of the space on Duke's poles necessary to protect workers from the "potentially lethal

voltage carried by [Duke's] electric lines."[9]  It is those power lines — not any telephone company's equipment — that creates the need for the safety space.  That is why the Commission has long held that electric utilities alone should bear the costs of that space.

Incumbent local telephone companies' attachments normally occupy the lowest usable space on electric utility poles — far away from the power lines.  *See Order* ¶ 53 (JA___-___).  Duke admits that it cannot charge cable companies or other telephone companies for the safety space, even though their attachments are closer to Duke's power lines.  Answer ¶ 12 n.38 (JA___).  Forcing incumbent local telephone companies to bear those costs would thus create the kind of rate disparities that Congress intended to prevent with Section 224's guarantee of just and reasonable rates for *all* providers of telecommunications service and cable companies.

## III.  There Is No Inconsistency Between the *Order* and the Non-Binding Enforcement Bureau Decision in *Verizon Florida*

Duke argues (at 18-31) that the Commission's *Order* "directly conflicts" with the Enforcement Bureau's decision in *Verizon Florida*.  That argument fails at the starting gate because, as the Commission (at 59-60) and AT&T (at 48) point

---

[9] Report and Order, *Amendment of Rules and Policies Governing Pole Attachments*, 15 FCC Rcd 6453, ¶ 20 (2000).

out, Enforcement Bureau decisions do not bind the Commission.  The Commission

therefore had no need to reconcile the *Order* with *Verizon Florida* or justify any

departure.  *See SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1037 (D.C.

Cir. 2017).

There also is no tension between the *Order* and *Verizon Florida*.  *See*

Commission Br. 64-65; AT&T Br. 48-52.  There, the Enforcement Bureau

acknowledged that Verizon *could* obtain refunds under the *2011 Order* and

rejected the electric utility's argument that such refunds would be unlawfully

retroactive.  *Verizon Florida* ¶¶ 17-19.  But the Bureau found that Verizon had not

carried its evidentiary burden to justify such refunds and dismissed the complaint

without prejudice so that Verizon could "fill the evidentiary gaps in the current

record."  *Id.* ¶¶ 24, 26.  Verizon and the utility then settled.

The Commission here similarly found that AT&T could obtain refunds

under the *2011 Order*, rejecting Duke's challenges to that order's applicability.

*See Order* ¶¶ 17-23 (JA___-___).  The Commission then found multiple pieces of

evidence established that Duke's rates were unjust and unreasonable, including that

Duke's rates exceeded the old and new telecom rates and were "disproportionate to

the amount of space AT&T and Duke each uses on the poles."  *Id.* ¶ 24 (JA___).

Thus, the different outcomes in *Verizon Florida* and the *Order* do not evidence a

13

departure from precedent; they reflect the application of the same standard under what the adjudicators found were different circumstances.[10]

## CONCLUSION

The Court should deny Duke's petition for review.

Respectfully submitted,

/s/ *Scott H. Angstreich*
Scott H. Angstreich
Alex P. Treiger
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
sangstreich@kellogghansen.com
atreiger@kellogghansen.com

*Counsel for Amicus Curiae USTelecom*
*– The Broadband Association*

July 13, 2023

---

[10] Even if *Verizon Florida* could be read to require a higher evidentiary standard to establish a Section 224(b)(1) violation than the standard the Commission applied in the *Order*, as the Commission notes (at 60 n.5), it already declined to follow that staff decision *before* issuing the *Order*. *See* Order on Reconsideration, *Verizon Md. LLC v. Potomac Edison Co.*, Proc. No. 19-355, FCC 22-26, ¶ 14 (rel. Mar. 31, 2022).

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. __22-2220__      **Caption:** Duke Energy Progress, LLC v. FCC

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓] this brief or other document contains ____2,995____ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓] this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word 2016 _____ [*identify word processing program*] in
14-point, Times New Roman _____ [*identify font size and type style*]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Scott H. Angstreich _____

Party Name USTelecom _____

Dated: 07/13/2023 _____

04/12/2020  SCC

# CERTIFICATE OF SERVICE

I hereby certify that, on July 13, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

 /s/ *Scott H. Angstreich*
Scott H. Angstreich

*Counsel for Amicus Curiae USTelecom – The Broadband Association*